**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

        -against-

JESSIE SMITH,
KENDALL JOHNSON,
        also known as "Duke," and
SAQUAN WARLICK,
        also known as "SB,"

                Defendants.

S1 19 Crim. 284 (RJD)

**DECLARATION OF ELIZABETH HINTON AND ELIZABETH ROSS**

Pursuant to 28 U.S.C. § 1746, ELIZABETH HINTON and ELIZABETH ROSS, declare under penalty of perjury that the following is true and correct:

1.      We are scholars of history, African and African American studies, and law at Harvard University. We submit this declaration based on our research and knowledge of American history, specifically domestic criminal justice policy.

2.      Elizabeth Hinton is Associate Professor of History and African and African American Studies at Harvard University. Starting on July 1, 2020, Professor Hinton will be Associate Professor of History and African American Studies and Professor of Law at Yale University and Yale Law School. Professor Hinton's work focuses on federal crime control policy and the rise of mass incarceration in the 20th century United States. In her award-winning book, *From the War on Poverty to the War on Crime: The Making of Mass Incarceration in America* (Harvard University Press, 2016), Professor Hinton examined the implementation of federal law enforcement programs beginning in the mid-1960s that made the United States home to the largest prison system in world history. *From the War on Poverty to the War on Crime* has received numerous awards, including the Ralph Waldo Emerson Prize from the Phi Beta Kappa

Society, and was named to the *New York Times*'s 100 notable books of 2016. Considered one of the nation's leading experts on the history of criminalization and mass incarceration, Professor Hinton's research has been supported by the Carnegie Corporation and the Ford Foundation. She regularly contributes articles and op-eds to publications such as the *New York Times*, *New York Times Book Review*, the *Los Angeles Times*, and *Time Magazine*.

3.      Elizabeth Ross is a PhD-JD candidate in the Department of African and African American Studies at Harvard University and Harvard Law School. Ms. Ross's work focuses on the criminalization of domestic social policies in the 1990s and its impact on racialized mass incarceration.

### *Historical Background*

### I.      The Targeting of African Americans in Federal Policy

4.      The increased penalties for trafficking near public housing projects that were enacted as part of the Violent Crime Control and Law Enforcement Act of 1994 ("the 1994 Crime Bill") should be considered one component of a larger set of domestic crime control policies that primarily focused on black youth and their families but have increasingly come to ensnare millions of Americans regardless of their race. Before the 1990s, national law enforcement programs targeted black Americans for longer sentences and more punitive treatment and introduced various forms of surveillance into social welfare programs. This strategy fueled the phenomenon known as mass incarceration and deepened racial injustices within the American criminal legal system.

5.      When President Lyndon Johnson declared the "War on Crime" in March 1965, he broke from the previous two centuries of American history. Crime control matters had previously rested under the domain of state governments. In the context of landmark civil rights legislation and unprecedented social change in the 1960s, however, Johnson established a role for the

federal government in police, courts, and prison systems for the first time. Johnson called for the

War on Crime one year after the launch of the War on Poverty in 1964 and in the context of

widespread civil unrest in the 1960s. In all, the nation witnessed 250 separate incidents of urban

civil disorder—what policymakers, journalists, and most of the public at large called "riots"—in

nearly every major American city during the second half of the 1960s.[1] During this period, a

growing consensus of policymakers, federal administrators, and law enforcement officials

believed that young African American men between the ages of fifteen and twenty-four were

primarily responsible for the unrest and came to understand crime as specific to this group.[2]

Black youth quickly emerged as the foremost target of policymakers, who concluded that only

intensified enforcement of the law in black urban neighborhoods would prevent disorder in the

future.[3]

---

[1] Elizabeth Hinton, *From the War on Poverty to the War on Crime: The Making of Mass Incarceration* (Harvard University Press, 2016); Heather Ann Thompson, *Whose Detroit?: Politics, Labor, and Race in a Modern American City* (Ithaca: Cornell University Press, 2004); Michael W. Flamm, *In the Heat of the Summer: The New York Riots of 1964 and the War on Crime* (Philadelphia: University of Pennsylvania Press, 2016); Jordan T. Camp, *Incarcerating the Crisis: Freedom Struggles and the Rise of the Neoliberal State* (Berkeley: University of California Press, 2016); Max Felker-Kantor, *Policing Los Angeles: Race, Resistance, and the Rise of the LAPD* (Chapel Hill: University of North Carolina Press, 2018).

[2] The specific targeting of black men between the ages of fifteen and twenty-four for national law enforcement programs runs through the memoranda and internal reports examined in Hinton 2016. Within the Johnson Administration, Nicholas deB. Katzenbach, et al., *The Challenge of Crime in a Free Society: A Report by the President's Commission on Law Enforcement and Administration of Justice* (Washington, DC: U.S. Government Printing Office, 1967), 5, 35, 44; and Otto Kerner, et al., *Report of the National Advisory Commission on Civil Disorders* (New York: Bantam Books, 1968) contain the most clearly articulated public expressions of this agenda.

[3] Hinton; *see also* Naomi Murakawa, *The First Civil Right: How Liberals Built Prison America* (Oxford: Oxford University Press, 2014); Naomi Murakawa, "The Origins of the Carceral Crisis: Racial Order as 'Law and Order' in Postwar American Politics," in *Race and American Political Development*, ed. Joseph Lowndes, Julie Novkov, and Dorian T. Warren (New York: Routledge, 2008), 234-55; Vesla Mae Weaver, "Frontlash: Race and the Development of Punitive Crime Policy," *Studies in American Political Development* 21(2): 230-265; Weaver "Frontlash: Race and the Politics of Punishment" (PhD diss., Harvard University, 2007) for further discussion on the criminalization of civil rights activists and urban civil disorder.

6.      The mission of Johnson's War on Crime was to expand surveillance and police patrol in low-income urban communities. Without evoking race explicitly, the White House and Congress built a set of punitive policies that focused on controlling this group by expanding the field of surveillance and patrol around them. Across political and ideological lines, federal policymakers shared a set of assumptions about African Americans, poverty, and crime, namely, they interpreted black urban poverty as pathological—as the product of individual and cultural "deficiencies." The seemingly neutral statistical and sociological "truth" of black criminality was wholly unsupported by empirical data, yet this stereotype guided the strategies federal policymakers developed for the War on Crime, first in the 1960s, then through the 1970s and the War on Drugs in the 1980s and beyond.

7.      The Omnibus Crime Control and Safe Streets Act of 1968, the first major piece of national crime control legislation, marked the beginning of federal investment and influence in American law enforcement and criminal justice that endured through subsequent reauthorizations and major federal crime control bills from the Anti-Drug Abuse Acts of 1986 and 1988 to the 1994 Crime Bill to, most recently, the First Step Act of 2019. When issues of law enforcement, sentencing, and confinement moved to the center of domestic policy following the enactment of the Safe Streets Act of 1968, the crime control strategies federal policymakers adopted yielded new possibilities for supervision in the halls of urban schools, in the elevators of housing projects, and in the reception rooms of welfare offices. The legislation made possible the rapid entry of police and law enforcement functions in social welfare initiatives. War on Poverty measures that had once provided education and training opportunities to residents in communities suffering from high rates of poverty and unemployment were increasingly replaced with police department programs dedicated to fighting local crime wars. From New York City to

Los Angeles, urban police officers manned outposts inside housing projects, directed after-school programs, delivered food and toys to needy families, and helped resolve marital disputes.[4]

8.     Soon, federal policymakers required employment initiatives, public schools, and grassroots organizations to partner with juvenile courts, police departments, and correctional facilities in order to receive funding. Over time, the vast and ever-expanding network of institutions responsible for surveillance, arrest, and incarceration evolved out of the fusion of law enforcement and social welfare programs—including public housing. The result was a historical and legal shift from controlling individuals to controlling communities and spaces.

9.     During the 1970s, the diffusion of crime control techniques into the everyday lives of low-income African Americans intensified as urban social programs were increasingly integrated into the bureaucracies, institutions, and industries that comprise American law enforcement and criminal justice. The ongoing imposition of separate and overlapping methods of surveillance, a process that fostered what historian Heather Ann Thompson has described as "the criminalization of urban space," came to define everyday life for low-income urban Americans on the ground.[5]

---

[4] Hinton, *From the War on Poverty to the War on Crime*; Julilly Kohler-Hausmann, *Getting Tough: Welfare and Imprisonment in 1970s America* (Princeton: Princeton University Press, 2017).

[5] Heather Ann Thompson, "Why Mass Incarceration Matters: Rethinking Crisis, Decline, and Transformation in Postwar American History," *Journal of American History* 97, no. 3 (2010): 706. On the relationship between crime control and social welfare, *see* David Garland, *Culture of Control*; Garland, *Punishment and Welfare: A History of Penal Strategies* (Surrey, UK: Ashgate, 1987); Michel Foucault, *Discipline and Punish: The Birth of the Prison* (New York: Vintage Books, 1995); Kohler-Hausmann 2017; Kohler-Hausmann, "Guns and Butter": The Welfare State, the Carceral State, and the Politics of Exclusion in the Postwar United States," *Journal of American History* 102, no. 1 (June 2015): 87-99; Loïc Wacquant, *Punishing the Poor: The Neoliberal Government of Social Insecurity* (Raleigh: Duke University Press, 2009); Joe Soss, Jacob S. Hacker and Suzanne Mettler, "The New Politics of Inequality: A Policy-Centered Perspective," in *Remaking America: Democracy and Public Policy in an Age of Inequality*, ed. Joe Soss, Jacob S. Hacker, and Suzanne Mettler (New York: Russell Sage Foundation, 2007), 3-24; Joe Soss, Richard C. Fording, and Sanford F. Schram, *Disciplining the Poor: Neoliberal Paternalism and the Persistent Power of Race* (Chicago: Chicago University

10.    In the 1970s, the arrest and incarceration of young African American men became a deliberate strategy to prevent future crime. From the perspective of President Richard Nixon's Advisory Council, his closest aides, and Nixon himself, at the heart of the crime problem lay the *street* crime problem, which was seen as a black, urban issue. Nixon officials assumed that the "criminal species" could be "found predominantly in the slums of urban America and not in the suburbs." The president himself expressed this sentiment bluntly. "You have to face the fact that the whole problem is really the blacks," Nixon's chief of staff H.R. Haldeman quoted Nixon as saying in Haldeman's diary entry from April 1969. "The key is to devise a system that recognizes this while not appearing to."[6] In a systematic way, Nixon recognized that the politics of crime control could effectively conceal the racist intent behind his administration's punitive domestic policies that directly targeted low-income African Americans.

11.    The decision on the part of the Nixon Administration to target young black men as a strategy to fight the War on Crime was further rationalized by the new theoretical and scientific approaches to understanding black criminal behavior. The influential political scientist James Q. Wilson worked in the Nixon Administration and attributed the increase of violent crime in the 1960s to the nation's growing youth population and urged policymakers to develop crime control programs based on demographic realities. "The only sure way we know of fighting crime is birth control," Wilson concluded. For Wilson, to curtail crime rates "short of locking up everyone under 30 years of age," urban police needed to make "the scene of the prospective

---

Press, 2011); Marie Gottschalk,  "Democracy and the Carceral State in America," *ANNALS of the American Academy of Political and Social Science* 651 (January 2014): 288-95; Bernard Harcourt, *Against Prediction: Punishing and Policing in an Actuarial Age* (Chicago: University of Chicago Press, 2007); William J. Novak, "Police Power and the Hidden Transformation of the American State," in *Police and the Liberal State*, ed. Markus D. Dubber and Mariana Valverde (Stanford, CA: Stanford Law Books, 2008); Carla Shedd, "Countering the Carceral Continuum: The Legacy of Mass Incarceration," *Criminology and Public Policy* 10, no. 3 (2011): 865–871.
    [6] H. R. Haldeman, *The Haldeman Diaries: Inside the Nixon White House* (New York: G. P. Putnam and Sons, 1994), 66.

crime" more secure.[7] And since black urban neighborhoods were thought to be the most likely scene of prospective crime, the federal government anchored the national law enforcement program in those neighborhoods with the purpose of rounding up potentially serious criminals. National law enforcement programs that focused on black neighborhoods from the outset heightened the chance of arrest for young African American men and fostered the rise of a statistical apparatus primarily concerned with measuring street crime. All of these reinforced the association between black neighborhoods and criminality and the escalation of punitive policies through the 1990s.

## II.      The Criminalization of Public Housing

12.      Due to structural racism and state-sponsored segregation measures that have made homeownership out of reach for African Americans, public housing projects have historically been occupied by majority people of color. In New York City in 2017, for example, black and Latino tenants constituted 91.5% of all public housing residents.[8] And nationwide, minorities constitute 67% of public housing residents.[9] The federal government played an important role in facilitating this segregation by actively redlining black neighborhoods, supporting racially restrictive covenants which forbid black people from buying property, and subsidizing segregated white suburbs.[10]

---

[7] James Q. Wilson, "Crime in the Streets," *Public Interest* 5 (1966): 32.

[8] NYU Furman Center, "Fact Brief: How NYCHA Preserves Diversity in New York's Changing Neighborhoods" (April 2019), Available at: https://furmancenter.org/files/NYCHA_Diversity_Brief_Final-04-30-2019.pdf; National Low Income Housing Coalition, "Who Lives in Public Housing" 3 (2012), Available at: https://nlihc.org/sites/default/files/HousingSpotlight2-2.pdf, archived at https://perma.cc/X6LL-UYYM.

[9] U.S. Dep't of Housing & Urban Dev., *Assisted Housing: National and Local Datasets*, https://www.huduser.gov/portal/datasets/assthsg.html.

[10] In effect, by guaranteeing home equity loans while simultaneously divesting and diverting resources from urban areas to suburban ones, the federal government redistributed wealth to middle-class white suburbanites. Beginning in 1934, Federal Housing Authority (FHA) loans made mortgages easier to attain than ever before for middle-class homebuyers. But because

13.     By the late 1970s, public housing developments suffered from extreme rates of racial segregation, poverty, residential abandonment, and crime. These problems continued to escalate when President Ronald Reagan launched the "War on Drugs" in 1984, amid a policy climate of disinvestment and federal retrenchment from social programs.[11] As it evolved during the Reagan Administration, antidrug policy forged even stronger linkages between social welfare and crime control programs, expanding general surveillance and the rise of mass incarceration in the process.

14.     To implement the Reagan Administration's strategies nationwide and coordinate the activities of criminal justice, law enforcement, and military officials at all levels of government, White House officials created the Drug Policy Board. This body designed and oversaw national punitive programs and developed the policies that would go on to inform the Omnibus Anti–Drug Abuse Act of 1988. Institutionalizing the recommendations of the Drug Policy Board, this Act began an unprecedented, targeted attack on drugs in public housing. The

---

FHA insurance required appraisals, homeowners were unable to purchase in "risky" neighborhoods. Segregated black neighborhoods automatically received the lowest-quality rating, often colored red on real estate maps (hence the term "redlining"). Appraisers consulted the FHA's *Underwriting Manual*, which instructed that "inharmonious racial or nationality groups" made a neighborhood undesirable for a prospective buyer." Kenneth T. Jackson, *Crabgrass Frontier: The Suburbanization of the United States* (Oxford: Oxford University Press, 1987).

[11] Between fiscal year 1981 and fiscal year 1982, the Reagan Administration cut annual federal spending on social programs from $94.8 billion to $88.8 billion, including a decrease of $490 million from child nutrition programs, and a $341 million reduction in AFDC payments. The poverty rate itself also rose from 15 percent in 1975 to 23 percent by 1987. Margy Waller, "Block Grants: Flexibility vs. Stability in Social Services" (Brookings Institute, Center on Children and Families no. 34, December 2005), Available at: http://www.brookings.edu/es/research/projects/wrb/publications/pb/pb34.pdf; Andrew E. Busch, *Ronald Reagan and the Politics of Freedom* (New York: Rowman and Littlefield, 2001); Richard S. Williamson, "A New Federalism: Proposals and Achievements of President Reagan's First Three Years," *Publius* 16 (Winter 1986): 11-28; "Strengthening the Social Fabric," *Christian Science Monitor*, November 15, 1988, 1; Leith Mullings, "Losing Ground: Harlem, the War on Drugs, and the Prison Industrial Complex," *Souls* 5, no. 2 (2003): 1-21; Ronald Reagan, *Radio Address to the Nation on Welfare Reform*, February 15, 1986, American Presidency Project, http://www.presidency.ucsb.edu/ws/?pid=36875.

legislation labeled drug dealers as "imposing a reign of terror on public and other federal assisted low-income housing tenants."[12]

15.     To fight drugs in public housing and ensure that they remained drug free, Congress amended the Housing Act of 1937 and required Public Housing Authorities ("PHAs") to add clauses to their leases prohibiting tenants, their household members, and guests from engaging in any drug-related criminal activity "on or off the public housing premises." Under the terms of the 1988 policy, any tenant who engaged in illegal activity in the vicinity of a public housing site could be evicted, and any person convicted of a drug offense would be permanently eliminated from all federal benefits. The 1988 legislation also required PHAs to collaborate with local police departments in developing crime prevention plans under the Public Housing Drug Elimination Program ("DEP") Section of the law. Across the United States, Housing Authorities and local police departments have shared records and worked to increase surveillance following its enactment.[13] The DEP provided funding through the Department of Housing and Urban Development ("HUD") for anti-drug efforts by local housing authorities, including collaboration with local police.[14] The effect of these and other efforts federal policymakers created to increase patrol and surveillance in public housing areas criminalized entire low-income, majority-minority communities.

16.     In the 1990s, policing tactics in public housing developments became even more aggressive. The leading research institute for policing practices, the Police Executive Research Forum, published a book in 1990 that examined drug crime-specific policing strategies employed

---

[12] 42 U.S.C § 11901.

[13] Emily Ponder Williams, "Fair Housing's Drug Problem: Combating the Racialized Impact of Drug-Based Housing Exclusions Alongside Drug Law Reform," *Harvard Civil Rights-Liberties Law Review* 2019, Vol. 54: 769-793.

[14] National Institute of Justice, *The Police, Drugs, and Public Housing*, research brief, by Barbara Webster and Edward F. Connors (June 1992).

in public housing.[15] It described approaches for "occupying the community," such as opening "mini-police stations" and increasing police presence and enforcement efforts within public housing developments,[16] with partial funding of these efforts coming from DEP.[17] In his announcement of $259 million in funding for a Clinton Administration initiative to fight crime and drugs in public housing, HUD Secretary Henry Cisneros asserted:

> These grants help to clean up drugs and crime in much of our nation's public housing. In the past, too many of our public housing developments became war zones, with gangs and drug dealers on the verge of gaining the upper hand. We're helping communities and law enforcement restore the safety and security that all American families deserve.[18]

The grants funded more law enforcement, stronger implementation of the public housing eviction policy, citizen patrols, prevention programs, and "security improvements," including fencing and security lighting.[19]

17.     Nearly a decade after Congress enacted the eviction provision in the Anti-Drug Abuse Act of 1988, President Clinton announced in his State of the Union address his own "One Strike" policy, codified in the Housing Opportunity Extension Act of 1996. One year later, newly appointed HUD Secretary Andrew Cuomo said of the law:

> Make no mistake about it; in public housing, drugs are public enemy number one. We must have zero tolerance for people who deal drugs. They are the most vicious, who prey on the most vulnerable. They are the jailers, who imprison the elderly. They are the seducers,

---

[15] Deborah Lamm Weisel, *Tackling Drug Problems in Public Housing: A Guide for Police* (Police Executive Research Forum, 1990).

[16] Ibid, 101-02.

[17] Jeffrey Fagan, Garth Davies, and Jan Holland, "The Paradox of the Drug Elimination Program in New York City," *Georgetown Journal on Poverty, Law, and Policy* 13 (September 2006): 416-17.

[18] Henry Cisneros, press release, October 4, 1996, HUD No. 96-178, https://archives.hud.gov/news/1996/pr96-178.cfm.

[19] Ibid.

who tempt the impressionable young. They must be stopped. 'One Strike and You're Out' is doing just that.[20]

In 2002, the Supreme Court upheld the policy, strengthening the criminalization of public housing residents as part of the federal War on Drugs.[21]   Although the one strike eviction policy remains in effect, during the Obama Administration HUD "softened its position" as part of the administration's criminal justice reform efforts, even encouraging PHAs to exercise discretion by not strictly enforcing the policy.[22] In its capacity as an active member of the Federal Interagency Reentry Council, HUD issued a guidance in late 2015 that highlighted the discriminatory impact of criminal history-based occupancy restrictions in HUD-subsidized housing.[23] The following year, in a separate guidance HUD outlined the discriminatory impact of these restrictions more explicitly: "Because of widespread racial and ethnic disparities in the U.S. criminal justice system, criminal history-based restrictions on access to housing are likely disproportionately to burden African Americans and Hispanics."[24]

---

[20] U.S. Department of Housing and Urban Development, *Meeting the Challenge: Public Housing Authorities Respond to the "One Strike and You're Out" Initiative* (Washington, DC, September 1997).

[21] *Department of Housing and Urban Development v. Rucker*, 535 U.S. 125 (2002).

[22] Michelle Y. Ewert, "One Strike and You're Out of Public Housing: How the Intersection of the War on Drugs and Federal Housing Policy Violates Due Process and Fair Housing Principles," *Harvard Journal on Racial & Ethnic Justice* 32 (2016): 58-60; Shaun Donovan to Public Housing Authority Executive Directors, letter, June 17, 2011, http://usich.gov/resources/uploads/asset_library/Rentry_letter_from_Donovan_to_PHAs_6-17-11.pdf.

[23] "This Council, made up of more than 23 Federal Agencies, meets on a regular basis to act on issues that affect the lives of those released from incarceration. An important aspect of the Reentry Council's work has been to have each Federal Agency identify and address 'collateral consequences' that individuals and their families may face because they or a family member has been incarcerated or has had any involvement with the criminal justice system." U.S. Department of Housing and Urban Development, *HUD Notice PIH 2015-9* (November 2, 2015), http://portal.hud.gov/hudportal/documents/huddoc?id=PIH2015-19.pdf.

[24] U.S. Department of Housing and Urban Development, *Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions* (Washington, DC, April 4, 2016), https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF.

18.     Despite a lack of sound data on the problem—one HUD official asserted in a 1996 memorandum to the Clinton Administration that "[t]here are no national figures on crime in public housing"[25]—the Clinton Administration and Congress continued to focus on public housing developments as a strategy to fight the War on Drugs. With federal funding, the Chicago Housing Authority collaborated with the Chicago Police Department to launch "Operation Clean Sweep" in 1994. These paramilitary sweeps involved "pre-dawn surprise [warrantless] searches of buildings leading to mass arrests in violation of basic constitutional rights quite similar to the periodic 'shakedowns' intended to rid prison wards of shanks and other contraband."[26] The sweeps also garnered the attention of the Clinton Administration, so much so that mere hours after the sweeps were ruled unconstitutional,[27] President Clinton ordered Attorney General Janet Reno and Secretary Cisneros "to develop—within the next 10 days—a search policy for public housing that is both constitutionally permissible and effective, and that can be implemented on a nationwide basis."[28] In response, the Department of Justice proposed seven steps PHAs should take to combat crime, six of which related to searches.[29] This move was described by one

---

[25] Davi Shipley to Bruce Katz and Amy Liu, memorandum, March 27, 1996, "FOIA 2006-1734-F - David Shipley, Speechwriter," *Clinton Digital Library*, https://clinton.presidentiallibraries.us/items/show/14483.

[26] Loïc Wacquant, "Deadly Symbiosis: When Ghetto and Prison Meet and Mesh" in *Mass Imprisonment: Social Causes and Consequences*, ed. David Garland (London: Sage Publications, 2001), 94.

[27] *Pratt v. Chicago Housing Authority*, No. 93 C 6985 (N.D. Ill. April 7, 1994).

[28] Bill Clinton, "Statement of the President of the Court Decision Regarding the Chicago Housing Authority's 'Operation Clean Sweep,'" "Public Housing Sweeps," Box 78, Domestic Policy Council, Bruce Reed, Crime, WJCPL.

[29] "Proposals for Restoring Safety to Public Housing," n.d., "Public Housing Sweeps," Box 78, Domestic Policy Council, Bruce Reed, Crime, WJCPL. The proposal included the following: (1)Public housing agencies (PHAs) should include in their lease agreements a provision banning the possession of firearms; (2) Public housing lease agreements should be amended to allow periodic administrative inspections for firearms; (3) PHAs should rely on their ability to obtain warrants to conduct administrative inspections of their buildings; (4) PHA tenant associations should adopt resolutions approving lease agreement provisions banning weapons and providing consent for firearms inspections; (5) PHAs should take steps to secure buildings through use of metal detectors, identification cards, and effective security guards; (6) Police

Congressman as a "shocking directive" to find a "way around the Constitution" with Clinton acting "almost alarmingly in respect to the residents' fourth amendment privacy protection."[30]

19.     In addition to Operation Clean Sweep and the similar efforts that followed across the country, a primary driver of the criminalization of public housing and its residents was Operation Safe Home ("OSH"). In printed campaign materials, the connection between OSH and black communities was clear. Asserting that "[t]he Clinton Administration is committed to working with African Americans to build a better future for all of our children," the campaign highlighted several efforts backed by the administration to purportedly aid black communities, including "[i]ntroducing Operation Safe Home to fight crime in public housing."[31] Tapping into the deep fear about crime and public housing, Cisneros remarked at a 1994 Operation Safe Home press briefing:

> Public housing residents literally live under the gun. Gangs control the stairwells of their buildings; they have to put their children to bed in bathtubs at night to protect them from stray bullets, keep them inside during the day for fear they'll be caught in somebody's crossfire. They live in places where the police themselves won't even go . . . Operation Safe Home will bring the law enforcement resources of the federal government, in cooperation with state and local authorities, to bear on violent crime in public and assisted housing.[32]

---

patrolling public housing should attempt to take weapons from violent criminals by aggressively using their authority to stop and frisk suspicious individuals; and, (7) Public housing authorities should rely on the exigent circumstances doctrine to conduct warrantless searches of individual units where there is probable cause to believe that evidence of a crime will be found in that unit or when emergency conditions require immediate action such as to pursue persons fleeing from the scene of a crime or to investigate a possible medical emergency resulting from a shooting incident.

[30] Senator Craig, speaking on H.R. 3355, 103rd Cong., 2nd sess., *Congressional Record* (August 25, 1994): S12567.

[31] Clinton/Gore campaign materials, June, 24, 1996, "African Americans for C/G [Clinton/Gore] '96," Box 8, Office of Speechwriting and James (Terry) Edmonds, WJCPL.

[32] Henry Cisneros, press briefing, February 4, 1994, "2/94 Operation Safe Home," Box 4, Office of Speechwriting and Jonathan Prince, WJCPL.

20.     In New York, approximately 400,000 people live in public housing developments operated by the New York City Housing Authority ("NYCHA").[33] As one scholar has noted, "like other locales, policing practices in NYCHA are rooted in part in the public perception of public housing as a major site of urban disorder and criminality in New York City. Policing practices in and around NYCHA developments are partly responsible for that perception."[34] Beginning in the late 1980s, NYCHA escalated the surveillance and social control of its residents under the Drug Elimination Program ("DEP"). To enforce the One Strike eviction policy, in 1988 NYCHA created the Anti-Narcotics Strike Force, a team of attorneys, investigators, and staff focused on evictions based on drug-related accusations and charges.[35] NYCHA first applied for DEP funds in 1989, with HUD funding a pilot program the following year. Funds increased, as did the size of the program, in 1991;[36] by 1995, DEPs were deployed in the majority of the City's public housing developments.[37] An evaluation of the program asserted: "The primary goal of DEP was to reduce drug use, drug sale, drug-related crime and collateral crime problems by strengthening both formal and informal social control in public housing developments. Increased police presence and targeted prosecutions were the mechanisms to increase formal social control."[38]

---

[33] New York City Housing Authority, NYCHA 2018 Fact Sheet 1, (2018) https://www1.nyc.gov/assets/nycha/downloads/pdf/NYCHA-Fact-Sheet_2018_Final.pdf.

[34] Alexis Karteron, "When Stop and Frisk Comes Home: Policing Public and Patrolled Housing," *Case Western Reserve Law Review* 69 (2019): 714-15.

[35] Fagan, Davies, and Holland, "The Paradox of the Drug Elimination Program in New York City," 429-30.

[36] Ibid, 427; citing New York City Housing Authority, Drug Elimination Program Grant Applications, various years (on file with NYCHA).

[37] Ibid.

[38] Ibid, 424-25.

21.     The "linchpin" of the NYCHA's Drug Elimination Program was Operation Safe

Home.[39] In New York City, from 1991 to 1994 the number of police officers participating in

OSH went up from forty-eight to eighty-one.[40] Then, in 1995, the Transit Police and Housing

Police merged with the NYPD, swelling the ranks of OSH officers from eighty-one officers and

nine sergeants to 400 officers with fifty-seven sergeants.[41] OSH centered on increasing law

enforcement presence within public housing developments, primarily through "vertical

patrols."[42] In New York City today, when an individual with a Housing Authority address is

arrested, the NYPD reports it to the NYCHA. Even more, if the NYCHA moves to terminate or

evict tenant(s) as a result of the arrest, the NYPD will provide crime reports, details, and

witnesses to support the process. In 2017, PHA officials in New York City brought in more than

1,500 cases of suspected drug-related activity, with 562 ending in the termination or exclusion of

a person from housing assistance.[43]

22.     The best available research has demonstrated that much of the attention given by

policymakers and law enforcement officials to crime in public housing developments "results

from presumptions and prejudice against those places and the people who live in and frequent

them."[44] When Congress moved to criminalize public housing tenants first in 1988, and then in

1994, they knew the provisions would disproportionately impact black residents. In the 1980s,

---

[39] Ibid, 427; citing New York City Housing Authority, Drug Elimination Program Grant Application, 1991 (on file with Fagan, et. al).

[40] Ibid, 427; citing New York Police Department, NYPD Operation Safe Home, Year End Reports, various years (on file with NYCHA).

[41] Ibid.

[42] "Vertical patrol is a process by which a Police Officer systematically and methodically checks each building one at a time, covering roof landings, stairwells and lobbies." NYPD, Frequently Asked Questions, http://www.nyc.gov/html/nypd/html/misc/pdfaq2.html.

[43] City of New York, Safety and Security at NYCHA: 2017 Report on Outcomes and Administrative Actions Related to Permanent Exclusion and Termination of Tenancy for Non-Desirability (2017), https://www1.nyc.gov/assets/nycha/downloads/pdf/2017-permanent-exclusion-report.pdf, https://perma.cc/9NH6-H7U4.

[44] Karteron, "When Stop and Frisk Comes Home," 691.

black Americans represented 12 percent of the U.S. population, 19 percent of the total number of renters, and 48 percent of all public housing residents. Because public housing tends to be highly segregated, large public housing projects usually have a higher percentage of black people. For example, in census tracts that were more than 70 percent black in 1990, 92 percent of public housing residents were black.[45] On the whole, people of color were more likely to reside in public housing in cities, and white people were more likely to own or rent their homes. Thus, people of color bore a disproportionate share of punitive public housing policy. A number of studies have shown that drug enforcement in majority-minority neighborhoods is far higher than actual incidents of drug use and sales in those neighborhoods. As a result, white people who are statistically more likely to use or sell drugs than people of color are less likely to be arrested and incarcerated for drug crimes.[46]

### III.   The Politics of Crime Control and the 1994 Crime Bill

23.   National policymakers escalated the War on Drugs during the 1990s "to achieve political, not policy, objectives."[47]  Pursuing their own political objectives, from 1989 to 1992, then-Senator Joseph Biden (D-DE) and then-Representative Charles Schumer (D-NY) led Democrats as they worked to reclaim the crime issue as part of the Democratic platform.[48] Schumer proclaimed that "it was imperative for the Democrats to put their own stamp on crime."[49] Republicans also worked to retain control of the crime issue. In 1992, during his first

---

[45] Department of Housing and Urban Development, Office of Policy Development, *The Location and Racial Composition of Public Housing in the United States*, by John M. Goering, Ali Kamely, and Todd Richardson (Washington, DC, 1994).

[46] Mona Lynch, Marisa Omori, Aaron Roussell, and Matthew Valasik, "Policing the 'Progressive' City: The Racialized Geography of Drug Law Enforcement," *Theoretical Criminology* 17, no. 3 (March 4, 2013): 338-39

[47] Michael Tonry, "Racial Politics, Racial Disparities, and the War on Crime," *Crime & Delinquency* 40, no. 4 (October 1994): 491-92.

[48] Guy Gugliotta, "Crime Bill a Hostage of Politics," *Washington Post*, Aug. 5, 1992, A1.

[49] Ibid, A14.

term serving as Attorney General, William Barr authored the report *The Case for More Incarceration*, in which he argued for implementing policies that would greatly increase the level of incarceration in the United States, even asserting that "[the] benefits of increased incarceration would be enjoyed disproportionately by black Americans living in inner cities."[50] That same year, when faced with evidence of discrimination in the criminal legal system, Barr testified in a congressional hearing that "our criminal justice system is designed to be fair and, in fact, is the fairest known to man."[51]

24.     Preparing for his run for the presidency, then-Governor Bill Clinton fully embraced the crime issue as part of his "New Democrat" political strategy. Clinton courted endorsements from police associations and unions,[52] touted his support for the death penalty (even leaving the campaign trail to oversee the execution of Ricky Ray Rector, a black prisoner who was so intellectually disabled that he saved the dessert from his last meal to eat after his execution),[53] and promoted a crime plan that called for more cops and fewer guns on the street.[54] In a particularly poignant moment, just before Super Tuesday, the Clinton campaign organized a press conference at Stone Mountain Correctional Facility. This small prison is located in Stone

---

[50] U.S. Department of Justice, Office of Policy Development, *The Case for More Incarceration*, by William P. Barr (Washington, DC: 1992): vi.

[51] U.S. Congress, House of Representatives, Select Committee on Narcotics Abuse and Control, *Role of the Department of Justice and the Drug War, Weed and Seed*, 102nd Cong., 2nd sess., May 29, 1992, 24 (testimony of William P. Barr).

[52] "Fraternal Order of Police to Endorse Clinton," *New York Times*, September 16, 1996, https://www.nytimes.com/1996/09/16/us/fraternal-order-of-police-to-endorse-clinton.html; Russell L. Riley, "Bill Clinton: Campaigns and Elections," *Miller Center,* n.d., https://millercenter.org/president/clinton/campaigns-and-elections.

[53] Nathan J. Robinson, "The Death of Ricky Ray Rector," *Jacobin Magazine*, https://jacobinmag.com/2016/11/bill-clinton-rickey-rector-death-penalty-execution-crime-racism.

[54] Gwen Ifill, "Clinton in Houston Speech, Assails Bush on Crime Issue: The Democrats," *The New York Times*, July 24, 1992, A13.

Mountain, Georgia, a town best-known for hosting the rebirth of the Ku Klux Klan.[55] The photograph that circulated in newspapers the following day was striking: four white politicians speaking in front of a group of nearly all black prisoners:[56]



25.      Once elected, President Clinton retreated briefly on crime to instead focus primarily on his losing battle for healthcare reform. Yet close advisors Bruce Reed and Jose Cerda remained staunch advocates for a "tough on crime" administration, arguing to Clinton in an October 1993 memorandum that crime was one of two of the "most powerful realignment issues" he could "seize," and "at a time when public concern about crime is the highest it has been since Richard Nixon stole the issue from the Democrats in 1968."[57] If he did indeed seize

---

[55] Jess Engebretson, "How the Birthplace of the Modern Ku Klux Klan Became the Site of America's Largest Confederate Monument," *KQED*, July 24, 2015, https://www.kqed.org/lowdown/19119/stone-mountains-hidden-history-americas-biggest-confederate-memorial-and-birthplace-of-the-modern-ku-klux-klan.

[56] Bill Clinton at Stone Mountain Correctional Facility (photo credit: Greg Gibson, 1992 AP).

[57] Bruce Reed and Jose Cerda to Bill Clinton, memorandum, October 27, 1993, "1994 Crime Bill - Memos to POTUS," Box 85, Domestic Policy Council, Bruce Reed, and Crime Series, WJCPL.

the opportunity, he could harken back to the era of Robert Kennedy, when "crime was a linchpin that helped hold the Democratic majority together across racial and class lines."[58] Despite sustained public concern about the crime issue, "the crime wave of the late 1980s and early 1990s had already begun to recede by the time Clinton and Congress acted in 1994."[59] Yet, as advisors to the president Rahm Emanuel and Michael Waldman wrote in a January 1994 memorandum:

> Legislatively, our goal is the passage of the Crime Bill. However, the Crime Bill is a means to a further end. The Crime Bill is also a vehicle to communicate to the public a set of strongly-held values that the President embraces, as well as the President's tough stance on crime and criminals.[60]

This was not just about crime, but a "means to a further [political] end."[61]

26.      After years of debates and multiple iterations, the final version of the 1994 Bill was the most expansive crime control legislation in the history of the United States.[62] It authorized the expenditure of $30.2 billion, including $13.5 billion for law enforcement (to hire 100,000 more officers), $9.9 billion for prison construction, and $6.9 billion for crime prevention. Moreover, it included a ten-year ban on semi-automatic assault weapons, made 60 federal crimes eligible for the death penalty, tied federal funding to states' adoption of truth-in-sentencing laws, and mandated life sentences for defendants charged with their third "strike."[63]

---

[58]  Bruce Reed and Jose Cerda to Bill Clinton, memorandum, October 27, 1993, "1994 Crime Bill - Memos to POTUS," Box 85, Domestic Policy Council, Bruce Reed, and Crime Series, WJCPL.

[59] Michael W. Flamm, *Law and Order: Street Crime, Civil Unrest, and the Crisis of Liberalism in the 1960s* (New York: Columbia University Press, 2005), 184.

[60] Rahm Emanuel and Michael Waldman, memorandum for circulation, January 27, 1994, "Strategy," Box 79, Domestic Policy Council, Bruce Reed, and Crime Series, WJCPL.

[61] Ibid.

[62] Lauren-Brooke Eisen, "The 1994 Crime Bill and Beyond: How Federal Funding Shapes the Criminal Justice System," *Brennan Center*, September 9, 2019, https://www.brennancenter.org/our-work/analysis-opinion/1994-crime-bill-and-beyond-how-federal-funding-shapes-criminal-justice.

[63] "Crime Bill: What Passed," *USA Today*, August 29, 1994, 5A.

27.     The prosecution of the wars on crime and drugs at the federal level produced disparate racial impacts within the American criminal legal system that had become apparent to legislators by the time they debated the 1994 Crime Bill. Federal policymakers were presented with several alternative strategies to address the problem of crime and drugs that involved treatment and prevention measures, as well as redirecting power and economic resources to low-income communities of color. Yet the White House and Congress pursued a course of action that expanded policing, surveillance, and incarceration. In the Bill's final version, Congress opted to drastically expand the nation's law enforcement apparatus without addressing the apparent racial disparities that sustained that system in any meaningful way.

28.     Indeed, federal policymakers and the Clinton Administration were aware of widespread and pervasive discriminatory impacts within the criminal legal system, and actively chose *not* to adequately address these issues, opting instead to expand the system as-is. As early as August 1991, the United States Sentencing Commission concluded in a special report to Congress that racial disparities in sentencing began to increase after 1984.[64] "This differential application on the basis of race," the Commission wrote, "reflects the very kind of disparity and discrimination the Sentencing Reform Act [of 1984], through a system of guidelines, was designed to reduce."[65] In response, Representative Don Edwards (D-CA) introduced the Sentencing Uniformity Act of 1992. On the House Floor, Edwards cited the Sentencing Commission's discovery that decisions to prosecute under the mandatory minimum sentences enacted in the 1980s:

> are based not on neutral factors, but rather on factors such as race, gender, crime rates and caseloads, circuit, and prosecutorial practices. In particular, a greater proportion of black defendants

---

[64] United States Sentencing Commission, *Special Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System (As directed by section 1703 of Public Law 101-647)*, Washington, D.C.: U.S. Government Printing Office, 1991,82.

[65] Ibid, ii.

> received sentences at or above the mandatory minimum level, followed by Hispanics, and then whites. Departures from the mandatory minimum are most likely to be granted to whites, and least likely to Hispanics.[66]

Some members of Congress shared Edwards's concerns about these statistics. In the words of Senator Carol Mosely Braun (D-IL), they demonstrated "overwhelming evidence of discrimination."[67]

29.      In addition to its attention to drug enforcement, the Sentencing Commission raised important points throughout the Crime Bill's legislative process about racial discrimination in capital punishment and other inequalities that fell hardest on black and Latino Americans. The Congressional Black Caucus ("CBC") seized on the Commission's findings and characterized the Crime Bill as overly punitive from the start. Stressing the structural causes of crime on the floor of the House and in op-eds, the CBC pushed for more funding for prevention efforts and programs like Head Start, an assault rifles ban, and a narrowing of the "three strikes" provision so that people who needed second chances could have them. In its 280-page alternative bill introduced to the House, the CBC pointed out that federal crime bills "do nothing to reduce crime and polarize and shift the focus and resources away from strategies that have proven to be more effective in addressing crime and violence."[68] The CBC found entirely different solutions, in "crime prevention measures that include drug treatment, early childhood intervention programs, full funding for Head Start programs and the Women, Infants and Children program, rehabilitation and alternatives to incarceration, community policing, and family support

---

[66] Representative Don Edwards, speaking on "Abolish Mandatory Minimum Sentences," 102 Cong., 2nd sess., *Congressional Record* (October 2, 1992).

[67] Senator Moseley Braun, speaking on "The Crime Bill," 103 Cong., 2nd sess., *Congressional Record* (August 22, 1994).

[68] Text of H.R. 3315 (103rd): Crime Prevention and Criminal Justice Reform Act, Introduced March 7, 1994. Available at: https://www.govtrack.us/congress/bills/103/hr3315/text/ih

programs, as well as in programs to rebuild communities through education, employment, and housing."[69] Indeed, compared to the Senate version, the CBC's bill devoted $2 billion more to drug treatment, $3 billion more to early intervention crime prevention programs for youth, and unlike the Senate bill, scrapped mandatory minimum sentences and money for regional prisons. The CBC bill received little traction or support in the House.

30.      Once its alternative bill was stymied, the CBC continued its efforts to ameliorate the worst aspects of the Crime Bill. The Racial Justice Act ("RJA") that the CBC introduced would have made it possible to use statistical evidence of racial bias to make habeas corpus appeals to overturn sentences of death. These provisions followed a study commissioned by Congress in which the United States General Accounting Office found "[a] pattern of evidence indicating racial disparities in the charging, sentencing, and imposition of the death penalty."[70] CBC Chair Kweisi Mfume (D-MD) argued on the House floor that "[t]he death penalty has proven to be the most atrocious display of government sanctioned racism that exists today in America . . . . History shows that minorities have received a disproportionate share of society's harshest punishments, from slavery to lynchings."[71] Given the 60 new offenses the Crime Bill made eligible for the federal death penalty, the sense of urgency to act was great. Many referenced Justice Blackmun's dissent from earlier that year in which he asserted that "the death penalty remains fraught with arbitrariness, discrimination, caprice, and mistake."[72] As Washington DC's representative Eleanor Holmes Norton put it at the time, prosecutors

---

[69] Ibid.
[70] United States General Accounting Office, *Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities*, Report to Senate and House Committees on the Judiciary (Washington, DC: February 1990): 5.
[71] Representative Mfume, speaking on H.R. 3355, 103rd Cong., 2nd sess., *Congressional Record* (August 21, 1994): H8999.
[72] *Callins v. Collins*, 510 U.S. 1141, 1144 (1994) (Blackmun, J., dissenting).

essentially "chose blacks for death."[73] Time and time again, the pleas of Holmes Norton and other black leaders were shouted and voted down.

31.   Citing "black-on-black crime," the opposition to the RJA argued that the result of the measure "might be more executions of blacks if we harshly impose a rigid quota system," an argument wholly unsubstantiated by facts.[74] Moreover, many policymakers claimed that the RJA was a "death penalty abolition act," although all the measure aimed to abolish was the disproportionate targeting of black Americans for the death penalty, not an end to capital punishment.[75]

32.   Still, members of the CBC went so far as to "offer[] to make major changes in the language that would substantially deal with the concerns of those who have been opposed to the measure."[76] This was to no avail. Clinton quickly went on the offensive, charging black staffers to aggressively lobby members of the CBC. Confronted with the refusal of Republican legislators (and some Democrats) to support a crime bill the included the RJA, Democratic leadership withdrew the provision, a move that Representative Louis Stokes (D-OH) asserted was "for reasons of racism" and "one step removed from endorsing lynch mobs."[77] The failure of the CBC's Racial Justice Act represents a lost opportunity in our history, when the racial disparities in the criminal legal system could have been better studied and addressed.

33.   The CBC's strong objections to many of the Bill's punishment provisions were not out of step with contemporary black opinion on crime and violence. Although African

---

[73] Norton quoted in Murakawa, 144.

[74] Representative McCollum, speaking on H.R. 3355, 103rd Cong., 2nd sess., *Congressional Record* (June 16, 1994): H4622.

[75] Senator Hatch, speaking on H.R. 3355, 103rd Cong., 2nd sess., *Congressional Record* (August 22, 1994): S12269.

[76] Representative Mfume, speaking on H.R. 3355, 103rd Cong., 2nd sess., *Congressional Record* (August 21, 1994): H8999.

[77] Representative Stokes, speaking on H.R. 3355, 103rd Cong., 2nd sess., *Congressional Record* (August 11, 1994): H7954.

Americans are far more likely to be victimized by street crime, they are consistently less punitive in public opinion measures and tend to support the kinds of crime prevention programs the CBC brought to the policy table.[78] Moreover, black journalists, city leaders, civil rights groups, and prominent ministers attacked the Bill vociferously. The NAACP called it a "crime against the American people," the *Philadelphia Tribune* said it would "bash black males," the Pittsburgh housing authority police chief said: "Most of the people who will be affected by that will be poor and black . . . Poor of any persuasion and black certainly!" Moreover, a number of organizations outside the CBC also urged Clinton to pursue social justice measures in African American communities, including the Citizens' Commission on Civil Rights, the Milton Eisenhower Foundation (which called for the federal government to spend $30 billion a year for ten years to finance education, housing, and drug prevention programs in black communities), and the Urban League (which recommended an even more expansive $50 billion a year, ten year "Marshall Plan" for American cities).[79]

34.     Repeatedly, however, the Bill's proponents endorsed a narrative that the black community was in favor of harsh, punitive policies, cherry-picking statements of support or outright misrepresenting the position of African American leaders. In one notable example, speaking against the RJA, Representative Bob Dornan (R-CA) stated:

> What disturbs me most about this provision, which is adamantly supported by the Congressional Black and Hispanic Caucuses, is that minorities — especially African-Americans — are overwhelmingly more likely to be victims of violent crime. Let us not forget the words of the Rev. Jesse Jackson who said, "there is nothing more painful to me * * * than to walk down the street and hear footsteps and start thinking about robbery — then look around

---

[78] Pew Research Center. 2013. King's Dream Remains an Elusive Goal; Many Americans See Racial Disparities. Washington, DC. Available at: http://www.pewsocialtrends.org/files/2013/08/final_full_report_racial_disparities.pdf.

[79] Monte Piliawsky, "The Clinton Administration and African-Americans," in *The Politics of Race: African Americans and the Political System*, ed. Theodore Rueter (London: Routledge, 2016), 395.

> and see somebody white and feel relieved." This statement reveals a great deal about crime in America — especially in our inner cities. And it is just outrageous that anyone would prioritize discrimination over victimization. How do these people sleep at night?[80]

In other words, Republican lawmakers used the cover of Jesse Jackson's statement to argue that African Americans were largely responsible for crime, suggesting that punitive approaches enjoyed black support (when in fact Jackson and other black leaders opposed the Crime Bill).

35.    Policymakers often used racially coded language when alleging associations between race and criminality or when objecting to provisions designed to alleviate racial discrimination in the criminal legal system. However, at times their language bordered on the explicit. For example, in an appeal to Republicans, Senator John Kerry (D-MA) urged passage of the Bill by evoking the earlier rhetoric of James Q. Wilson and others who linked black family dysfunction to crime. He argued that in segregated black and Latino communities, "you will find a rate of illegitimate birth at 70 to 80 percent" as compared to a rate of 23 percent among whites. He linked these rising rates to "crack houses replacing some communities as the focus of life" and young black men "dying at a rate that exceeds any American war in history."[81] In another instance, Senator Bob Dole (R-KS) declared:

> Unfortunately, the American family today is in tatters. More than two-thirds of all black children, and nearly 25 percent of all white children, are born to unwed mothers. In some inner-city communities, the illegitimacy rate is a staggering 80 percent, as thousands of children are born each year into a world without fathers and to mothers who are simply unprepared for the responsibilities of Motherhood.[82]

---

[80] Representative Dornan, speaking on H.R. 3355, 103rd Cong., 2nd sess., *Congressional Record* (August 21, 1994): H2604.

[81] Senator Kerry, speaking on H.R. 3355, 103rd Cong., 2nd sess., *Congressional Record* (August 23, 1994): S12324.

[82] Senator Dole, speaking on S. 1607, 103rd Cong., 1st sess., *Congressional Record* (November 18, 1993): S16272.

In a later debate, Senator Dole entered into the record and recommended to his colleagues an "important" article authored by controversial social scientist Charles Murray, who the following year gained notoriety for authoring *The Bell Curve*, an argument for the innate inferiority of African American intelligence. In the article, Murray asserted that "the brutal truth is that American society as a whole could survive when illegitimacy became epidemic within a comparatively small ethnic minority. It cannot survive the same epidemic among whites."[83] Murray's arguments have since been refuted, but in the mid-1990s they had a profound influence on policymakers and the American public.

36.     In the White House, despite the Clinton Administration also publicly advocating for some of the non-punitive, prevention measures of the Crime Bill—provisions that Senator Dole and many others on the political Right classified as "pork"—some high-level members of the President's domestic policy council were less enthused. In a January 1994 memorandum for circulation, Rahm Emanuel and Michael Waldman asserted:

> The President has succeeded in redefining the debate on crime. No longer is it prevention vs. punishment. Instead, the issue of crime and violence has been changed to punishment and values (learning the difference between right and wrong.) Polls show that the issue of crime, along with health care and the economy, tops the public's list of concerns. In addition, polls show that a majority of Americans feel that the moral fabric of our society is disintegrating. Therefore, by redefining the issue of crime in terms of punishment and values, we get the best of both worlds.[84]

Writing to Bruce Reed in April 1994, Jose Cerda referred to the prevention program proponents as the "hug-a-thug crowd."[85]

---

[83] Charles Murray, "The Coming White Underclass," *Wall Street Journal*, October 9, 1993; entered into the record by Senator Dole, speaking on S. 1607, 103rd Cong., 1st sess., *Congressional Record* (November 8, 1993): S15316.

[84] Rahm Emanuel and Michael Waldman, memorandum for circulation, January 27, 1994, "Strategy," Box 79, Domestic Policy Council, Bruce Reed, and Crime Series, WJCPL.

[85] Jose Cerda to Bruce Reed, memorandum, April 26, 1994, "Crime Bill - Prevention," Box 74, Domestic Policy Council, Bruce Reed, and Crime Series, WJCPL; In July 1995, Rahm

37.     As the Bill went through the legislative process, Clinton sacrificed the interests of the CBC and their allies in order to concede to the Republican Party's demands to limit the prevention aspects of the legislation. The final Bill did include funding for some youth programs in public housing projects, including Boys and Girls Clubs and Midnight Basketball. However, while these programs were cited as effective in crime-prevention, there was no discussion on how increased mandatory penalties would interact with such programs to enhance or diminish public safety.

38.     During the debates, CBC Chair Mfume "implore[d]" his colleagues to retain the prevention measures in the Bill. He asked that they "[p]lease permit those of us facing the worst of the problem— those of us who have grown up and lived amid the crime, the drugs and the violence— some input on how we should address the situation."[86] However, this plea largely went unanswered. Mfume led 26 of 38 members of the CBC to support the legislation. But Mfume and others did so in order to get what little prevention measures that were included in the Crime Bill to their constituents. This was hardly a full endorsement. In fact, a sizable number of black Democrats voted against the Bill in its final passage vote because of their opposition to its punitive features and lack of mechanisms for addressing racial impacts. As Representative Bobby Scott (D-VA) explained: "You wouldn't ask an opponent of abortion to look at a bill with

---

Emanuel echoed this view in a memorandum to the President in which he advocated for a revamping of the administration's drug strategy based on public opinion, not prevention. He wrote, "People fundamentally believe that hard core drug users drive crime and violence in this country, and this should be the basis of any strategy to address this problem. In essence, we need to change our focus on fighting hard core drug use away from rehabilitation and more towards fighting crime and violence, so that it is consistent with our overall crime message." Rahm Emanuel to Bill Clinton and Leon Panetta, memorandum, July 10, 1995, "Talking Points [4]," Box 126, Domestic Policy Council, Carol Rasco, and Issues Series, WJCPL.

[86] Representative Mfume, speaking on H.R. 3355, 103rd Cong., 2nd sess., *Congressional Record* (August 21, 1994): H8999.

the greatest expansion of abortion in the history of the United States, and argue that he ought to vote for it because it's got some highway funding in it."[87]

39.     The 1994 Crime Bill did contain a provision directing the Sentencing Commission to study the 100-to-1 crack-cocaine sentencing disparity and report "on the current federal structure of differing penalties for powder cocaine and crack cocaine offenses and to provide recommendations for retention or modification of these differences."[88] The original amendment proposed by Representative William Hughes (D-NJ), the author of the Cocaine Penalty Study provision, would have equalized mandatory minimum penalties for crack cocaine and powder cocaine. He offered the modified amendment and spoke from the House floor about why this study was needed and why the original amendment would have been justified:

> The information is before us now that there is no difference pharmacologically between crack cocaine and powder cocaine. In addition to that, crack cocaine is no more addictive than powder cocaine. The bottom line is that poor people are the ones that use crack cocaine and mostly minorities. It is interesting that about 95 percent of those that are charged with crack cocaine violations are black and other minorities. Compared to coke, powder cocaine is used by the more affluent in our society. I think most people understand that it is a gross inequity and we need to rectify it. I think even my colleagues on the Republican side understand that there is a gross disparity, and we need to do something about it.[89]

Representative Walter Tucker (D-CA) commented, "I believe that the information will come back to corroborate what most of us already know, and that is that there is a gross disparity

---

[87] Scott quoted in Allan Smith, "Fact Check: Why are Trump and the Democrats talking about the 1994 Crime Bill," NBC News. Available at: https://www.nbcnews.com/politics/2020-election/fact-check-why-are-trump-democrats-talking-about-1994-crime-n1010691

[88] United States Sentencing Commission, "Special Report to Congress: Cocaine and Federal Sentencing Policy (as directed by section 280006 of Public Law 103-322)," (Washington, D.C.: United States Government Printing Office, 1995), iii.

[89] Representative Hughes, speaking on H.R. 3355, 103rd Cong., 2nd sess., *Congressional Record* (August 21, 1994): H2594.

between the sentencing between powder cocaine and crack cocaine."[90] Representative John

Conyers (D-MI) added, "to no one's surprise—91 percent of those sentenced for crack are

African-American. Yet the majority of people who use crack every day are white—64.4

percent. . . . The impact of this on the black community is enormous."[91] Not all legislators agreed

that a study was the best course of action, advocating instead for immediate measures given that

the result of the status quo was that "our prisons are full of black males who have used crack

cocaine, and the more affluent white boys in the community who have used the powder cocaine

are on probation."[92]

40.     The amendment calling for the Sentencing Commission's study enjoyed the

support of some Republicans, including the author of the House amendment establishing the

100-to-1 sentencing scheme, Representative Clay Shaw (R-FL). Similarly, Representative Bill

McCollum (R-FL) endorsed the study and acknowledged the sentencing disparity from the

House floor. However, rather than advocating that the penalties for crack-cocaine be lessened,

hence eliminating the grossly unjust disproportionate impact on black Americans, McCollum

argued that "we ought to be raising the penalties for the powder cocaine."[93] Shaw, McCollum,

and other Congressional Republicans consistently urged that the unfairness of the sentencing

scheme could be addressed by raising penalties for powder cocaine. And yet no such proposal

was included in the 1994 Bill. Put another way, policymakers were well aware of the racial

disparity in the crack and powder cocaine sentencing scheme, systematically rejected a number

---

[90] Representative Tucker, speaking on H.R. 3355, 103rd Cong., 2nd sess., *Congressional Record* (August 21, 1994): H2594.

[91] Representative Conyers, speaking on H.R. 3355, 103rd Cong., 2nd sess., *Congressional Record* (August 21, 1994): H2595.

[92] Representative Rose, speaking on H.R. 3355, 103rd Cong., 2nd sess., *Congressional Record* (August 21, 1994): H2595.

[93] Representative McCollum, speaking on H.R. 3355, 103rd Cong., 2nd sess., *Congressional Record* (August 21, 1994): H2594.

of alternative solutions to address the law's impact on black Americans, and yet refused to address the disparity even with a thoroughly punitive approach, which would have punished drugs associated with white offenders more harshly.

41.     Ultimately, federal policymakers did nothing to address the racial discrimination in the justice system as they set out to expand prisons, foot patrol, and surveillance in low-income communities. Thus, Clinton's celebration of the Crime Bill as "a big step towards bringing the laws of the land back into line with the values of our people," essentially brought criminal justice policy in line with one value only: locking up more people of color. This was, in large part, accomplished by putting even more mandatory minimums and sentencing enhancements on the books. One such enhancement was the provision related to drug trafficking near public housing.

42.     A version of the federal public housing provision was first introduced at the state level in 1989 as an expansion of the Illinois Safe School Zone Act/Illinois Juvenile Court Act of 1987. The law mandated that youths as young as fifteen, who sold illegal drugs within 1,000 feet of a school or a public housing development, were to be tried as adults.[94] Originally the law only specified schools, but the legislature overrode a gubernatorial veto to expand the safe zone to include public housing. The racial implications of this provision quickly became clear. By 1992, all young people charged and transferred for drug crimes under Illinois law were black.[95]

43.     Though not targeted specifically to youth, in 1991 Senator Bill Bradley (D-NJ) proposed an uncontroversial amendment to the Controlled Substances Act which "provide[d] enhanced penalties for drug dealing in or near housing facilities owned by a public housing

---

[94] Jason Ziedenberg, "Drugs and Disparity: The Racial Impact of Illinois Practice of Transferring Youth Drug Offenders to Adult Court," *Building Blocks for Youth*, April 2001.
[95] Sarah Karp, "State Drug Law Hits City, Teens, Minorities," *The Chicago Reporter*, May 2000.

authority."[96] In his remarks, Bradley referred to public housing developments as "open air drug markets," in which "by the afternoon or early evening, the streets and hallways are abuzz with drug trafficking and violence."[97] Bradley went on to assert, "[t]hese parents know the calendar. They breathe easier in the winter, when some of the drug dealers actually prefer to be in prison, where it is warm and cheap, and they can stay in business."[98] Congress failed to pass crime legislation that year.

  44. The public housing provision reemerged during the debates on the 1994 Crime Bill. Speaking in support of the Bill and the public housing provision, Senator Bradley opened by stoking fear of crime, evoking the image of "some drugged up young thug" and referencing images from the "nightly news."[99] Bradley then acknowledged that "young, black, and Hispanic men" met the "profile of the threatening person," "at least as depicted by the media and suggested by their disproportionate presence in our prisons."[100] Bradley then stated: "We don't like to talk about this perception, but it is there."[101] Bradley also said that "many people" rely on this fear of "young, black, and Hispanic men" when taking "subtle and not-so-subtle actions," "[r]egardless of how much the fact that most victims of crime share the same race as their victimizers."[102] It was in this context that Bradley highlighted the public housing provision as among those provisions that would be "particularly helpful in making our communities safer" and "effective in shoring up public confidence in our criminal justice system."[103]

---

[96] Senator Bradley, speaking on S. 1271, 102nd Cong., 1st sess., *Congressional Record* (June 27, 1991): S8878.

[97] Ibid.

[98] Ibid.

[99] Senator Bradley, speaking on H.R. 3355, 103rd Cong., 1st sess., *Congressional Record* (November 17, 1993): S15959.

[100] Ibid.

[101] Ibid.

[102] Ibid.

[103] Ibid.

45.     Bradley's provision became federal law in the 1994 Crime Bill. Although the overall Bill was the product of extensive debate, virtually no discussion (and no sustained study) accompanied the adoption of the public housing provision. Our research reveals, however, that the driving force behind the 1994 push for amending Section 616 of the Senate bill to include public housing in its list of drug-free zones came directly from HUD.[104] In an April 1994 memorandum to members of the President's domestic policy council, HUD officials named the provision as one of the proposals for which HUD requested support and assistance as the bill moved through conference negotiations.[105] In this memorandum, HUD included this sentencing enhancement as one of "a few items within our joint efforts under Operation Safe Home that we would suggest as additional eligible activities under certain provisions in the crime bill."[106] In a June 1994 letter to Representative Jack Brooks (D-TX), the lead sponsor of the House bill, Attorney General Reno included this provision in her "recommendations of the Administration concerning the reconciliation of the final House and Senate versions" of the Crime Bill, but tied it directly to "[m]easures to combat youth gangs and facilitate gang prosecutions."[107] It could not have been lost on policymakers that this would most clearly impact black youth, both because of the disparities in the juvenile justice system and the nature of gangs. As Senator Biden declared on the Senate floor:

> Unfortunately, in many jurisdictions, blacks are much more likely than whites to be referred to court, formally charged, and institutionalized in the juvenile justice system. While whites account for 70 percent of juvenile arrests nationwide, they make up only 35 percent of youth in custody. Blacks account for only 25 percent of

---

[104]   Bruce Katz, Bill Gilmartin, and Liz Arky to Rahm Emanuel, Brice Reed, Ron Klain, and Chris Edley, memorandum, April 12, 1994, "Crime Bill - Prevention," Box 74, Domestic Policy Council, Bruce Reed, and Crime Series, WJCPL.

[105] Ibid.

[106] Ibid.

[107] Janet Reno to Jack Brooks, letter, June 13, 1994, "Conference Report," Box 70, Domestic Policy Council, Bruce Reed, and Crime Series, WJCPL.

> juvenile arrests, yet account for 44 percent of the youth in custody.[108]

And a 1992 Congressional Research Service Report for Congress on youth gangs found that "[c]urrent studies indicate that gang members are predominantly black or Hispanic."[109]

46.     The transformative 1994 legislation stood alongside another set of policies that further illuminate how the decision to respond to the problem of crime with more policing and more incarceration has not only targeted black Americans individually, but has fostered the devastation of black communities as a whole. Citing expense, Congress rejected a $30 billion urban aid package proposed soon after Clinton took office, but enthusiastically allocated similar funding levels towards the incarceration and policing of those same communities two years later. Moreover, although Clinton's 1996 welfare reform was perhaps the most visible manifestation of the federal government's assaults on basic social needs, policymakers went on to slash funds for public transportation, health, and anti-poverty programs, while withdrawing its own request for $161 million in subsidies that would have assisted low-income citizens in paying their home heating bills.

47.     Although the contribution of the Crime Bill to the policing and incarceration of black communities is difficult to estimate (the trend had been underway well before the Clinton Administration), the Bill and surrounding debates further entrenched the notion that crime in urban cores was a problem best managed through harsh punishment. In 1994, the incarceration rate was 564 per 100,000 citizens, rising to 601 in the year after the 1994 Crime Bill and steadily thereafter until hitting 684 during Clinton's last year in office. Building the largest and most expensive penal system in world history appeared to be more politically feasible than ensuring

---

[108] Senator Biden, speaking on H.R. 3355, 103rd Cong., 1st sess., *Congressional Record* (November 19, 1993): S16303.

[109] U.S. Library of Congress, Congressional Research Service, *Youth Gangs: An Overview*, by Suzanne Cavanaugh and David Teasley (June 9, 1992), 4.

minimal levels of material security to the most marginalized populations. The aftershocks of these policy choices can still be felt today.

48.      The rise of mass incarceration over the past fifty years has disrupted millions of American families, nearly all of whom are low-income. However, the expansion of the prison system has had especially severe consequences for people of color. Black Americans and Latinos together constitute 59 percent of the nation's prisoners, even though they make up less than a third of the entire U.S. population.[110] In recent decades, Latino Americans have entered the nation's carceral institutions in greater numbers, but they are disproportionately entrapped in the growing system of immigration detention. African Americans have in the long term been hit the hardest by punitive domestic policies. Regardless of socioeconomic status, African Americans are more likely to serve prison or jail time than any other racial group in the United States. Odds are 50–50 that young black urban males are in jail, in a cell in one of the 1,821 state and federal prisons across the United States, or on probation or parole. And assuming arrest and sentencing practices continue in their present form, African Americans born after 1965 and lacking a high school diploma are more likely than not to go to prison.[111] The lawmakers who passed the 1994 Crime Bill played a significant role in creating this unequal system, and the historical record demonstrates that they did so knowingly and intentionally.

---

[110] Within prisons for adult men, black Americans constitute 37 percent of inmates, followed by white Americans at 32 percent, and Latino Americans at 22 percent. U.S. Department of Justice, *Prisoners in 2013*, Bureau of Justice Statistics Bulletin, by E. Ann Carson (Washington, DC, September 2014), 1, http://www.bjs.gov/content/pub/pdf/p13.pdf.

[111] More than half of young black men in major urban centers are currently in prison or jail, and across the nation black men are 6.5 times more likely than white men and 2.5 times more likely than Latino men to encounter the carceral state. Bruce Western, *Punishment and Inequality in America* (New York: Russell Sage Foundation, 2006), 31, 195; see Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* (New York: New Press, 2011), 16; U.S. Department of Justice, *Prisoners in 2009*, Bureau of Justice Statistics Bulletin, by Heather C. West, William J. Sabol, and Sarah J. Greenman (Washington, DC, rev. October 27, 2011); Adam Gopnik, "The Caging of America," *The New Yorker*, January 30, 2012.

Dated: Cambridge, Massachusetts
       May 26, 2020

                                        /s/
                                        Elizabeth Hinton

                                        /s/
                                        Elizabeth Ross